## Miller, et al. v. Harrell, By, et al.

(Decided May 11, 1917.)

### Appeal from Bullitt Circuit Court.

1. Wills—Revocation.—A substantial compliance with the provision of Section 4833, Kentucky Statutes, is necessary to effect a revocation of a will when properly executed.

2. Wills—Destruction of Will—Ratification—Revocation.—The destruction of a will by a third person by the direction and consent

of the testator, but at a considerable distance from him and out of his presence and hearing, even though afterwards ratified and approved by the testator, will not amount to a revocation of the instrument.

3. Wills—Revocation—Intention.—It is not the intent alone that controls in the revocation of wills, but the intent must be coupled with an act amounting to the revocation, such as burning or otherwise destroying, and if the destruction be by a third person it must be by the direction and consent of the testator and in his presence and with intention to revoke the same.

CHARLES CARROLL, L. D. GREENE T. C. CARROLL and WALLACE A. McKAY for appellants.

W. N. DAVIS, ROBERT L. PAGE, C. P. BRADBURY and J. F. COMBS for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

This is a controversy over a paper, purporting to be the last will and testament of Greenup Miller, a bachelor, of Bullitt county, who died August, 1915, leaving no father, mother, brother or sister; his nearest relatives being uncles, aunts and cousins. The alleged will disposes of both real and personal property, amounting in value to several thousand dollars. The testator became sick with walking typhoid in August, 1915, and shortly thereafter took to his bed. Within two or three days following he asked his attending physician, Dr. Tydings, to make a pencil sketch, or copy of a will, disposing of his property according to an outline which he gave. At first it appears that he wanted this as a model to go by, only. Accordingly Dr. Tydings prepared a paper with pencil, and this was duly signed by the testator, Miller, and witnessed by Dr. Tydings and W. F. Joyce. There is no question about the proper execution of this writing. Mr. Joyce was a cousin, by marriage, to the testator. On the day of the execution of the will in pencil, the testator desiring to put it into a more permanent and enduring form, requested Mr. Joyce to procure writing paper, pen and ink and make a copy of the pencil will so that it might be executed in permanent form. That evening Mr. Joyce obtained the paper, pen and ink, and undertook to rewrite the will, using almost the same verbiage and following the outline given by the testator as to the disposition of the property. However, he was unable to complete the copy that night, and next

morning, while assisting in waiting on the testator, the matter of rewriting the will was discussed between testator and Joyce, and Joyce inquired of the testator what disposition he desired to make of the property willed to Gladys Harrell in case of her death without issue? To which testator replied that he desired the remainder to go to the Kentucky Masonic Widows' & Orphans' Home. Following out this direction, Mr. Joyce concluded the will, and at the suggestion of the testator, called two neighbors, W. B. Mattingly and J. D. Moore, as witnesses, who came to the house of the sick man to witness the will. Thereupon the testator signed the will written in ink, and called upon Mr. Mattingly and Mr. Moore to witness the same, which they did in proper form, and this is not questioned. Shortly after this, upon the same or succeeding days, Joyce, out of the presence and away from the testator and without direction from him so to do, destroyed the pencil will by burning it in a stove. This burning, however, was afterwards approved by Miller, who talked of it in these words: "That is what I wanted done; I wanted that destroyed when the other was written." The testator gradually grew worse, and his relatives gathered at his home. Not many days later, Miller had Joyce called on the telephone and asked him to come to his house. When they were alone the testator said to Joyce, "I want to do away with my will." Joyce asked: "Why?" To which Miller replied, "Well, the way I made it I am afraid there will be some trouble about it; I don't want it;" then Joyce said, "Well, I have the copy." Miller then said, "What did you do with it?" And Joyce replied, "The will—I did not have any place to keep the will, no safe, and I put it in an envelope and give it to Mr. Mattingly to put away in his safe, and it is down there." Then Joyce asked him, "Do you remember about the one, the outline, Dr. Tydings made?" Miller answered, "Didn't you burn that up, destroy it?" Joyce answered, "Did you want that one?" Miller said, "No, I don't want that one; the one written with pen and ink is my will, that is the one I am asking you about;" then Joyce answering said, "I will go to Mattingly's and get it this evening or in the morning." The next day Joyce brought the will to the sick room while the doctor was there and offered it to Miller, whereupon Miller said, "The doctor don't want me to get out of bed; don't

want me to move. The nurse says it is dangerous for me to move about. Will you destroy this paper for me?" To which Joyce answered, "Yes;" then Miller went on, "There is no stove in here, Will, and I want you to take it out of the house and burn it up; I don't want to risk setting the house on fire; and there is no stove to burn it in." Joyce answered, "All right," and further testifying, Joyce said, "I taken it out of the house to destroy the paper there and then and I decided to wait." The will was not destroyed until some days later.

When the question arose, Joyce, at the instance of the probate court, reproduced what he and the other witnesses to the will considered a correct copy of it, which contains an exact disposition of the property as set forth in the original will. This paper is as follows:

"Cupio, Ky., Aug. 22, 1915.

"Know All Men by These Presents:—That I, G. H. Miller, being of sound and disposing mind, memory and understanding, do hereby make this my last will and testament, in the manner and form following, and do hereby will that in case of my demise, all of my property both real and personal shall be sold by two administrators who shall be selected out of the membership of Miles Lodge No. 341 F. & A. M., and who shall dispose of the proceeds of the sale as follows: After all of my just debts shall have been paid, one-half of the proceeds and money on hand shall be placed in the hands of the Kentucky Children's Home for the purpose of giving my ward, Miss Gladys Harrell, of the Kentucky Children's Home, the benefit of an education in some good school of training; after she shall have completed her education and arrived at the age of twenty-one years, all the remainder of this amount, after her schooling is paid, shall be paid over to her; but in case of her demise during the time that she is in school, or afterwards, if she should die without issue, after all the necessary expenses shall have been paid, all of the remainder of this amount shall then be paid over to the Kentucky Masonic Widows' and Orphans' Home. Of the remaining half, five hundred dollars I will to the Miller family graveyard and to keep the same in repair. Three hundred dollars I will to the benefit of Knox Creek Church. One-half of the remainder I will to Miles Lodge No. 341 F. & A. M., to be used for any good that the members of

the Lodge may elect. The last remaining, I will to the Kentucky Masonic Widows' and Orphans' Home.''

The Bullitt county court refused to probate the paper as the last will of Greenup Miller, and the propounders appealed to the Bullitt circuit court where the case was fully heard before the court, without the intervention of a jury, and the paper was found to be the last will and testament of Greenup Miller, and was ordered probated. From this order the contestants appealed to this court.

About seven or eight years before the death of Greenup Miller and during the life of his mother, she and Greenup Miller obtained Gladys Harrell, an orphan child about six or seven years old, from the Kentucky Masonic Widows' & Orphans' Home, and took her into their home, as their ward, where she remained until after the death of the testator. She was never, however, legally adopted by Miller. The mother of Greenup Miller died some years previous to her son, but Gladys continued to live in the home and was well taken care of and provided for. From the testimony it is evident that Greenup Miller had in his mind a purpose to provide Gladys Harrell an education and comfortable home during his life, and take good care of her in his last will and testament. He very often expressed the desire to give her a good education and to make other provisions for her. At the time of his death she was about fifteen or sixteen years of age and was loved by him as his natural child. He often spoke of his love for the child. This is the same Gladys Harrell mentioned in the will. It is also certain that the relatives of Greenup Miller, none of them close in blood, were ever intimately associated with him or appeared interested in his welfare. While they were not estranged, there was a lack of interest. It is obvious that Gladys Harrell was the best loved person among the objects of the testator's bounty.

The testamentary capacity of Greenup Miller is not questioned. It is also admitted he was free from undue influence and that the writings executed as his last will were identical, except in phraseology and in one or two slight details, and expressed his desire respecting the disposition of his property. The circuit court in delivering its opinion and judgment made a separate finding of fact and law, at the joint request of the parties interested, and no motion and ground have been filed for a new

trial raising any question with respect to the finding of fact.

The record thus made up presents the sole question, Can a will be effectually revoked, through destruction, by a third person, out of the presence of the testator, even though done by his direction and with his consent, the destruction afterwards ratified and confirmed by testator?

The law governing the execution and revocation of wills in Kentucky is fully and minutely set forth in the statutes, and to be effectual, the execution, as well as the revocation of a will, must substantially conform to the provision of the statute.

Section 4833, Kentucky Statutes, provides:

"No will or codicil, or any part thereof, shall be revoked, unless under the preceding section, or by a subsequent will or codicil, or by some writing declaring an intention to revoke the same, and executed in the manner in which a will is required to be executed, or by the testator, *or some person in his presence and by his direction,* cutting, tearing, burning, obliterating, cancelling or destroying the same, or the signature thereto, with the intent to revoke."

It will be observed that this statute provides that no will or codicil shall be revoked except by marriage, unless by some writing declaring an intention to revoke the same, executed in the manner in which a will is required to be executed, or by the testator, *or some person in his presence and by his direction,* cutting, tearing, burning, obliterating, cancelling or destroying the same, or the signature thereto, with the intention to revoke.

This will was not revoked or attempted to be revoked by any writing whatever, but it is asserted by appellants that the will of Greenup Miller was revoked by its destruction by Joyce under Miller's direction. Joyce did destroy it by direction and instruction from Miller, and no doubt Miller entertained the necessary intent to revoke it. Thereafter the fact was reported to the testator, who then and there approved and confirmed the act. It is insisted, however, by appellees that this did not work a revocation under our statute since the act of destruction was not in the presence of the testator; that a destruction of a will by a third person, in order to work a revocation, must not only be by the direction and with the consent of the testator, but must be in *his presence* and with intention on his part to revoke.

Appellants contend that a destruction of a will by direction of the testator, through an agent, whose act is afterwards approved and ratified by the testator, conforms in all respects to the requirements of the statute, and in legal contemplation is a destruction by the testator himself. It is said Joyce was only an agent or instrument employed by Miller to carry out his purpose. The instruction to destroy the will was given by Miller; it was destroyed at his instance and by his direction with intention to revoke, and the act afterwards approved by him, and this it is urged amounted to a destruction of the will by Greenup Miller himself. Appellants rely upon the maxim, *Qui facit per alium facit per se.* They insist that the act of Joyce in destroying the will of Miller became the act of Miller when, with full knowledge of the facts, Miller ratified the same.

It therefore resolves itself into a question of whether the destruction of a will by an agent of the testator, under his express instruction and direction so to do, amounts, when afterwards ratified by him, to the act of the testator, and therefore be equivalent to his act, and considered in the constructive presence of the testator.

Schouler in his learned treatise upon the subject of wills, section 387, in discussing the subject of revocation of wills by destruction of the instrument, says:

"Both presence and direction of the testator being thus essential where the act is performed by another, a will is not legally revoked, though destroyed by the testator's own order, if burned or torn where he did not or could not see or take cognizance of the deed done."

And this text is supported by numerous authorities. By the ancient English statutes of frauds, it was provided that a revocation of a written devise of lands or any interest therein might be effected by burning, cancelling, tearing or obliterating the same either by the testator himself, or *another in his presence and by his direction and consent.* Later this statute was amended so as to require the destruction to be with intention of revoking the will. The Kentucky statute carries this amendment also in these words: "With the intent to revoke." From these ancient statutes has sprung our more recent law in Kentucky, as well as other states of the Union, most of them requiring, as in Kentucky, that the destruction of the will shall be by the testator, *or in his presence and by his direction* with intention of

revoking the same. It is also well settled in Kentucky that the intention of the testator to revoke a will not coupled with a revocatory act, does not produce a revocation. It is no less true that no revocation can be had without an intention so to do on the part of the testator. It is likewise true that the destruction must be in the actual presence of the testator in order to amount to a revocation. In the case of Steele, &c. v. Price, &c., 5 B. Monroe 60, this court in passing upon this question made use of this language:

"But the third section of the statute requires the revocatory acts, to which alone is given effect, to be done by the testator himself, or to be caused by him to be done in his presence. And therefore, neither the casual loss or destruction of the will, without the agency or knowledge of the testator, nor his subsequent knowledge of the fact, nor his failure to renew the will, nor all together, constitute a statutory revocation. In the case of N. Beauchamp's will, it not only appeared that the testator was informed of the destruction of the will, but that he said that he had ordered it himself; that the law would make a will for him, and he did not renew it. There was no express proof of the statutory revocation, because it was not expressly proved that the will was destroyed in the presence of the testator."

In this case the witness Joyce testified: "I taken it (the will) out of the house to destroy it, there and then and I decided to wait." He further says that the will was not destroyed for a day or so thereafter and at a time when the testator was not informed of his intention to perform the act, and out of the presence and hearing of the testator although it was by his request and direction. It is a well recognized rule in Kentucky, as well as elsewhere, that even though the testator give direction for the destruction of his will and the will be taken from his presence, under such direction and instruction, for the purpose of destruction, but is not in fact destroyed even though the testator be deceived into the belief that his instructions have been obeyed, and dies in this belief, the will afterwards appearing, must be admitted to probate if it is otherwise regular. So, if in this case, Joyce had preserved the will, even though directed to destroy it, and afterwards falsely informed testator Miller that the will had been destroyed for the purpose of misleading him into that belief, and Miller accepted the statement

and relied upon it, and then and there ratified the destruction, which he believed had taken place, the paper thereafter appearing, would be entitled to probate under the rule in this state. In other words, it is not the intent alone that controls, but the intent must be coupled with the act of destruction, either by the testator *himself or by another in his presence.* Neither is the act of destruction alone sufficient to revoke a will without the intent. These rules have been recognized and adhered to since the earliest organization of this court, following the English decisions and the ancient statute of fraud, which was promulgated for the purpose of discouraging and avoiding frauds and perjuries in such cases.

The appellants' contention that the destruction of the will in this case was in the constructive presence of the testator is too great a stretch of the statute. Such a construction would establish a dangerous precedent by opening wide the door for frauds and perjuries, which the statute was enacted to prevent. The execution or revocation of a will is a solemn matter, and the statute requires certain formalities in the performance thereof, which are intended to induce care and deliberation, and a failure to substantially comply with the statutory requirements, although the paper correctly express the will of the testator, requires the probate court to refuse to recognize the instrument as a last will and testament. By constructive presence, as used in reference to the execution of wills, is meant such presence as close proximity and opportunity to see and observe with the natural eye, the signing, or act of revocation, which is being performed with reference to the testamentary paper, and which afford the testator reasonable opportunity to see that the correct paper is being witnessed or revoked, as the case may be, instead of a spurious one. Measured by this rule, the destruction of Greenup Miller's will, at least one-half mile from his sick room where he was confined, some days after he had directed it to be done, and where he could not see nor hear what was going on, could not with reasonable consideration for the language used in our statutes, be considered in his presence, either actual or constructive, even though done by his direction and by a specified person, the destruction being subsequently ratified by him. The question of constructive presence has often been discussed by this court in cases similar to

this, but nowhere better than in the case of Orndorff v. Hummer, 12 B. M. 619:

"There must, therefore, be some limit to the doctrine of constructive presence. And the requisition that if the subscription be not in the same room in which the testator lies, it must be clearly in view, so that by the exertion of his own volition and his own physical power, he may, by mere change of position in the bed, see it if he will, is a sufficiently liberal, and perhaps too liberal, a stretch of the constructive presence, which will meet the objects of the statute."

Again, in the case of McKee v. McKee's Exr., 155 Kentucky 738, the court says:

"It is clear from the reasoning in that case that the doctrine of 'constructive presence' cannot be safely enlarged so as to be applied under the facts of this case. Here not only could the testatrix not see the attesting witness, but by reason of her deafness she could not hear what was going on in the adjoining room between the nurse and Mrs. Long; in fact, she could not have known that Mrs. Long was in the adjoining room except from what the nurse reported to her."

In the same opinion the court, after discussing other questions and citing numerous authorities, concludes in these words:

"Many persons wait until their last days—even hours —to make wills; they are frequently then weak and debilitated; at such times they are usually surrounded by persons who are interested in the disposition of their property; under such conditions opportunity for fraud or deception is frequently presented, and the incentive for its perpetration is great.

"Manifestly the legislature had these things in mind when it laid down these strict rules for the execution of wills, and clearly it would be unwise for the courts to relax them.

"It is a solemn thing to dispose of one's property by will—especially on a deathbed—and the legislative purpose as clearly evidenced by this statute was to require it to be done in such way as to eliminate, as far as human laws can, all possibility of fraud, deception or imposition.

"Any material deviation from the manner of execution required by the statute must necessarily be fatal to the validity of such an instrument."

Since section 4833 provides in specific terms how a will may be revoked when once executed, and the terms of this statute are no less mandatory than section 4828 with respect to the *making of a will,* we can see no good reason why a material deviation from the manner provided by the statute for the *revocation of a will* would be less fatal.

We, therefore, conclude that the destruction of the will by Joyce out of the presence of the testator, even though thereafter ratified by him, did not in fact amount to a revocation of the will, under our statute, and that the paper, a copy of which was presented in the Bullitt circuit court and proven, was in fact the last will and testament of Greenup Miller.

Judgment affirmed.